IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANGELA OLEKSA,<br><br>    Plaintiff,<br><br>vs.<br><br>KNOW INK, LLC, d/b/a KNOWINK,<br><br>Serve at:   Scott Leiendecker<br>            Manager<br>            460 N. Lindbergh Blvd<br>            St. Louis, MO 63141-7808<br><br>        and<br><br>        FRK Inc.<br>        Registered Agent<br>        231 S. Bemiston Ave, Suite 1111<br>        Clayton, MO 63105-1914<br><br>and<br><br>SCOTT LEIENDECKER,<br>    in his Individual Capacity,<br><br>Serve at:   Scott Leiendecker<br>            27 Oakleigh Lane<br>            St. Louis, MO 63124<br><br>and<br><br>TRINET USA, INC., d/b/a TRINET,<br><br>Serve at:   CSC-Lawyers Incorporating<br>            Service Company<br>            Registered Agent<br>            221 Bolivar Street<br>            Jefferson City, MO 65101<br><br>        Defendants. | Case No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Plaintiff, Angela Oleksa (hereinafter referred to as "Plaintiff" or "Mrs. Oleksa"), by and through Counsel, and for her cause of action against Defendants, Know Ink, LLC d/b/a KNOWINK (hereinafter referred to as "Defendant Company"), Scott Leiendecker, in his individual capacity (hereinafter referred to as "Defendant Leiendecker"), and TriNet USA, Inc. d/b/a TriNet (hereinafter referred to as "Defendant TriNet") (collectively referred to as the "Defendants"), states to the Court as follows:

### JURISDICTION AND VENUE

1. Mrs. Oleksa is an individual residing in St. Louis County, Missouri, which is within the jurisdiction of the United States District Court, Eastern District of Missouri, Eastern Division.

2. Defendant Company is a limited liability company organized under the laws of the State of Missouri with its principal place of business in St. Louis County, Missouri.

3. Defendant Company's principal place of business is located within the jurisdiction of the United States District Court, Eastern District of Missouri, Eastern Division.

4. Defendant Company conducts business in multiple states within the United States.

5. Defendant Leiendecker is an individual residing in St. Louis County, Missouri, which is within the jurisdiction of the United States District Court, Eastern District of Missouri, Eastern Division.

6. Defendant TriNet is a corporation organized under the laws of the State of Delaware with its principal place of business in Dublin, California.

7. This Complaint is authorized and instituted pursuant to the Equal Pay Act of 1963, 29 U.S.C. §206(d) ("Equal Pay Act").

8. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1343 and 1367.

2

9. Venue is proper under 28 U.S.C. §1391.

## PARTIES

10. Mrs. Oleksa is a female and as such is a member of a protected class under the Equal Pay Act.

11. Defendant Company is engaged in the business of election technology, which is an industry affecting commerce.

12. Defendant Company has employed more than 15 employees during all weeks in both the current and preceding calendar year.

13. Defendant Leiendecker is a male.

14. Defendant Leiendecker is the manager of Defendant Company and is the ultimate decision maker for Defendant Company.

15. Defendant TriNet is a professional employer organization engaged in the business of providing human resources support and services to businesses, which is an industry affecting commerce.

16. Defendant TriNet has employed more than 15 employees during all weeks in both the current and preceding calendar year.

17. Defendant TriNet designates itself as a co-employer of Defendant Company's employees in its Worksite Employee Handbook.

18. A copy of the TriNet Worksite Employee Handbook ("Handbook") was provided to Mrs. Oleksa during her employment.

19. At all times herein mentioned, Defendant Company was as an "employer" within the meaning of the Equal Pay Act, 29 U.S.C. §203(d).

20. At all times herein mentioned, Defendant Leiendecker was an "employer" within the meaning of the Equal Pay Act, 29 U.S.C. §203(d).

21. At all times herein mentioned, Defendant TriNet was as an "employer" within the meaning of the Equal Pay Act, 29 U.S.C. §203(d).

22. At all times herein mentioned, Mrs. Oleksa was an "employee" of Defendants within the meaning of the Equal Pay Act, 29 U.S.C. §203(e).

## FACTS

23. In 2019, Defendant Company hired Mrs. Oleksa to be the Director of Technical Service and Support.

24. As Director of Technical Service and Support, Mrs. Oleksa oversaw a technical service and support team responsible for ensuring successful elections for clients of Defendant Company who were utilizing the Defendant Company's products.

25. Mrs. Oleksa sought out opportunities in her role as Director of Technical Service and Support to prove her skills and dedication with aspirations of advancing her career with Defendant Company.

26. Mrs. Oleksa had many accomplishments during her employment with Defendant Company, including but not limited to the following:

    a. oversaw approximately two thousand jurisdictions in calendar years 2020-2024;

    b. developed a remote call center and transitioned her entire local team to remote work in calendar year 2020, during the COVID-19 pandemic;

c. transitioned her entire local team back into the office when Defendants ordered employees back into the office following the COVID-19 pandemic and was the only department head to do so at the time of her constructive discharge;

d. created and executed several standard operating procedures ("SOPs") that drove her department and were still in use at the time of her constructive discharge;

e. designed a workflow for Defendant Company's internal employees, business partners and clients necessary for SOC2 compliance, in addition to numerous other workflows necessary for the successful operation of her department and other departments within Defendant Company;

f. developed and executed an incentive program for her team that was driven off client feedback;

g. created job descriptions for the different positions within her department;

h. assigned and trained onsite support staff for 117 jurisdictions in 2021, 181 jurisdictions in 2022, and 152 jurisdictions in 2023;

i. designed state territories for rovers in Ohio, New York, Alabama, Missouri and Virgina

j. hired, trained and managed the rovers and was the point of contact and oversaw their activities on election days;

k. managed the technical project managers for LA, New York City, and Cook County;

l. planned team building and bonding events in 2021 and 2023, which included workshops, trainings, float trips, escape rooms, bowling events, dinners,

Cardinals' games, a leadership retreat to the Ozarks and other events/activities to keep her team engaged and increase employee productivity/retention;

m. developed five departmental metrics with written processes for each one, which were still in place at the time of her constructive discharge;

n. traveled on behalf of Defendant Company to meet with high-risk clients on-site, ensuring client retention and providing onsite support for elections in New York City, Ohio and New Jersey;

o. revised the client change request process, a process which had been failing under another department's leadership, and aligned all teams involved to ensure clients change requests were being successfully implemented;

p. developed an extensive training program for the technical services and support team;

q. handled standard personnel functions for her department, including conducting new hire interviews, annual employee appraisals and performance improvement plans, as well as working with staffing agencies to fill temporary seasonal positions;

r. conducted weekly CS leadership meetings and a monthly department meeting to ensure employees of Defendant Company were receiving relevant information critical for the success of the Defendant Company and maintaining open lines of communication; and

s. developed a department report that was sent to executives weekly to keep them apprised of what was taking place in her department.

27. During her employment with Defendants, Mrs. Oleksa was provided with a copy of the Handbook, which states that TriNet and Defendant Company were co-employers of Mrs. Oleksa.

28. The Handbook contains a Policy Against Harassment and Discrimination and Retaliation.

29. During her employment, Mrs. Oleksa's paychecks were issued by Defendant TriNet.

30. On or about December 15, 2022, despite outstanding job performance, Mrs. Oleksa initially received a $10,000 bonus, which was $5,000 less than the bonus she had received in 2021.

31. Upon information and belief, at least three of Mrs. Oleksa's male subordinates and at least one of Mrs. Oleksa's male peers received a $20,000 bonus in December 2022, for performing substantially equal work under similar working conditions.

32. Upon information and belief, Defendants' other female employees did not receive any bonus in December 2022.

33. Mrs. Oleksa asked Defendant Leiendecker why her bonus was decreased in 2022 despite her strong work performance, and Defendant Leiendecker told her that he had just looked at the bonus list and knew he had to make a cut from somewhere and selected Mrs. Oleksa.

34. Based on the above information, Mrs. Oleksa believes the bonuses of Defendants' female employees, including Mrs. Oleksa's, were decreased to allow for higher bonuses to the male employees.

35. Mrs. Oleksa informed Defendant Leindecker that given her outstanding job performance she objected to having her bonus reduced while her male subordinates and peers received higher bonuses.

36. After being confronted by Mrs. Oleksa, Defendant Leiendecker increased Mrs. Oleksa's 2022 bonus to $15,000, which was still $5,000 below her male subordinates and peers.

37. The Defendants' decision to pay Mrs. Oleksa a lower bonus than her male subordinates and peers was willful.

38. Despite feeling discouraged by being overlooked in favor of her male co-workers, Mrs. Oleksa continued working on her department's growth and continued to attempt new initiatives to help the Defendants' success despite a lack of support from her supervisors, including Defendant Leiendecker.

39. In December 2023, Defendants refused to provide Mrs. Oleksa with any bonus information or include Mrs. Oleksa in the process surrounding bonuses, even though in prior years she was the individual who contacted her team to notify them of their bonuses.

40. Upon information and belief, Defendants excluded Mrs. Oleksa from the bonus process in December 2023 in retaliation for her drawing attention to the discriminatory way bonuses were awarded in 2022 and to prevent her from knowing how her 2023 bonus compared to her male subordinates and peers.

41. Mrs. Oleksa only received a $5,000 bonus in December 2023 despite her continued outstanding job performance.

42. Upon information and belief, Mrs. Oleksa's 2023 bonus was lower than male subordinates and/or male peers who were performing substantially equal work under similar working conditions.

43. Upon information and belief, Defendants' decision to pay Mrs. Oleksa a lower bonus than those paid to her male subordinates and peers in 2023 was willful.

44. Upon information and belief, in addition to decreased bonuses, Mrs. Oleksa was not paid a comparable salary to her male peers.

45. In 2022, Mrs. Oleksa's salary was $92,700.00.

46. Upon information and belief, Keith Klein, who was Director of Software Development for part of the time Mrs. Oleksa was employed with Defendants, was receiving approximately $140,000 in salary in 2022.

47. Keith Klein is a male.

48. Keith Klein and Mrs. Oleksa's positions were substantially equivalent in terms of skills, effort, and responsibility, although Mrs. Oleksa outperformed Mr. Klein.

49. Mrs. Oleksa and Mr. Klein came from similar educational backgrounds and had similar work history and technical backgrounds.

50. Mr. Klein was hired as a director after Mrs. Oleksa.

51. Mr. Klein and Mrs. Oleksa worked in the same building under similar working conditions.

52. Keith Klein was unable to perform certain functions of his role which were given to Mrs. Oleksa to perform, such as revising the client change process for Defendant Company.

53. Under Mr. Klein, the various teams within Defendant Company needed for client change requests were not working together, and client change requests were not being processed in a satisfactory manner.

54. Defendant Company assigned the client change request process to Mrs. Oleksa when Mr. Klein was unable to successfully accomplish same, and Mrs. Oleksa was successful in revising the client change request process to make it run efficiently.

55. Despite having a substantially equivalent position to Mr. Klein in terms of skills, effort, and responsibility, working under similar working conditions, and outperforming Mr. Klein, Defendants paid Mrs. Oleksa less compensation than they paid to Mr. Klein.

56. In 2022, Mrs. Oleksa began reporting to Brock Killen, who at the time was the new Chief Operations Officer for Defendant Company.

57. In October 2022, during her performance review with Mr. Killen, Mrs. Oleksa requested a raise to $120,000, citing her numerous accomplishments in her position; the failure of the Defendants to provide her with a sufficient raise up to that point despite those accomplishments, and her concerns about the pay discrepancy between her and Keith Klein's salaries despite their comparable backgrounds and position within Defendant Company.

58. Mr. Killen agreed that Mrs. Oleksa deserved the requested raise; however, Mr. Killen stated he needed approval from Defendant Leiendecker and was meeting resistance from Defendant Leiendecker.

59. Mr. Killen left his employment with Defendant Company before the matter of Mrs. Oleksa's raise could be concluded.

60. Following Mr. Killen's departure, Mrs. Oleksa inquired with Jamie Schneider, the Defendant Company's Chief of Human Resources at the time, as to the status of Mrs. Oleksa's requested raise.

61. Ms. Schneider informed Mrs. Oleksa she would ask Defendant Leiendecker about Mrs. Oleksa's requested raise.

62. Upon information and belief, weeks later, Defendant Leiendecker denied Mrs. Oleksa's request for raise.

63. Ms. Schneider informed Mrs. Oleksa the reason given by Defendant Leiendecker for denying Mrs. Oleksa's raise was that he, "was not prepared to move forward at that time."

64. In approximately April of 2023, Mrs. Oleksa expressed concerns to her new supervisor, Patrick Werner, about her bonuses being cut and once again demanded the raise she had been denied, without justification, in October 2022.

65. Mr. Werner said he agreed Mrs. Oleksa deserved the raise.

66. In July 2023, Mr. Werner conducted Mrs. Oleksa's performance review citing no issues with her performance, and Mrs. Oleksa was given a raise to $115,000 effective August 1, 2023, almost ten months after Mrs. Oleksa initially asked for a raise to $120,000.

67. Upon information and belief, Keith Klein was still making at least $25,000 more than Mrs. Oleksa even following Mrs. Oleksa's raise, despite working in a position requiring equivalent skills, effort, and responsibility and working under similar working conditions.

68. Upon information and belief, from the date Keith Klein began working as Director of Software Development until Mrs. Oleksa's constructive discharge in May 2024, he was paid more than Mrs. Oleksa despite both Mrs. Oleksa and Mr. Klein working in positions requiring equivalent skills, effort and responsibility and working under similar working conditions.

69. As set out above, Mrs. Oleksa opposed the Defendants' practice of paying female employees less than male employees when performing jobs requiring substantially equal skill, effort and responsibility under similar working conditions and addressed the issue directly with her immediate supervisors and Defendant Leiendecker.

70. Page 13 of the Handbook states in relevant part, "This policy prohibits any form of retaliation against a worksite employee or anyone else who makes a good faith complaint of

discrimination or harassment or who participates in an investigation by your company or its agents, or an investigation, proceeding or hearing conducted by a state or federal agency or court."

71. Despite having a Handbook that states retaliation is prohibited, Mrs. Oleksa believes Defendants retaliated against Mrs. Oleksa for her protected conduct.

72. Mrs. Oleksa believes she was removed from the performance review process in 2023 in retaliation for objecting to her decreased bonus in 2022 and pointing out that her bonus was lower than her male subordinates and peers.

73. Mrs. Oleksa further believes the decrease in her bonus in 2023 to only $5,000 was also in retaliation for her demands of equal treatment in 2022.

74. Mrs. Oleksa further believes that Defendants began altering her job duties and working conditions in retaliation for her demands of equal pay.

75. In 2023, Ken Terry was asked to attend educational conferences and demos instead of Mrs. Oleksa.

76. Ken Terry was Mrs. Oleksa's male subordinate, and she was not consulted about his time away from his job within her department, nor was she being given equal opportunities to attend educational conferences and demos relevant to her role within Defendant Company.

77. Mrs. Oleksa designed state territories for rovers in Ohio, New York, Alabama, Missouri and Virgina and then, hired, trained and managed the rovers and was the point of contact and oversaw their activities on election days until 2024 when this task was removed from Mrs. Oleksa despite her success and given to a male co-worker.

78. In 2022, Mrs. Oleksa developed EV/ED weekly meetings, which she ran for over a year with no issues until the meetings were ultimately taken over by Mrs. Oleksa's supervisor, Patrick Werner, who claimed the meetings would be better handled at the "chief" level.

79. Patrick Werner shortly thereafter handed the duty for running the EV/ED weekly meetings to Mrs. Oleksa's male subordinate, Ken Terry, who was not a chief level employee.

80. Despite successfully revising the client change request process at Defendant Company's request when Mrs. Oleksa's male peer, Keith Klein, was unable to do so, this function was taken away from Mrs. Oleksa by her supervisor, Patrick Werner, in 2024, and was given to two male employees, Keith Klein and Ken Terry.

81. Mrs. Oleksa was excluded from numerous other meetings she previously led that involved her team only to discover her male supervisors had assigned responsibility for leading those meetings to Mrs. Oleksa's male subordinates.

82. Eventually, Defendants removed most of Mrs. Oleksa's leadership duties despite her being the director of her department, and Defendants stopped inviting Mrs. Oleksa to meetings out of town with her team she had previously attended.

83. In February 2024, Mrs. Oleksa expressed her concerns to her supervisor, Patrick Werner, about the fact that her job duties were being diminished; she was being excluded from meetings; she was never permitted to learn or grow within her role at the Defendant Company, and that her male subordinates, namely Ken Terry and Dan Peters, were always chosen for opportunities to attend conferences and demos and given the growth opportunities.

84. Mrs. Oleksa further expressed her concern that she was being pushed out of her position with Defendant Company.

85. Patrick Werner dismissed and refused to address Mrs. Oleksa's concerns and told her to "assume positive intent."

86. When Mr. Werner did not give her a satisfactory response and ultimately disregarded her concerns, Mrs. Oleksa went to Derek Winter, the Defendant Company's Chief Operational Officer, to address her concerns and Mr. Werner's disregard of said concerns.

87. Mr. Winter's response was to tell Mrs. Oleksa that he heard her concerns, and while he hated to be the bearer of bad news, he didn't think the situation was going to change.

88. Mr. Winter then went on to tell Ms. Oleksa that if she felt she was being pushed out of the Company, she shouldn't want to be there feeling that way.

89. Not only did Mr. Winter also dismiss Mrs. Oleksa's concerns, she got the clear impression he was telling her to quit, because it was not going to change.

90. After the refusal of any of Mrs. Oleksa's supervisors to address the issues she was raising regarding her rapidly deteriorating and toxic work environment, Mrs. Oleksa knew the Defendants' discriminatory treatment of her and other females in the Defendant Company and its retaliation against her for challenging said discriminatory treatment would not change.

91. It became clear to Mrs. Oleksa the Defendants were deliberately making her employment environment intolerable to force her to leave her employment with Defendants in retaliation for her protected conduct under the Equal Pay Act.

92. The toxic, discriminatory and hostile work environment at Defendant Company negatively impacted Mrs. Oleksa's physical/mental health and wellbeing, as well as her self-esteem.

93. Furthermore, the toxic, discriminatory and hostile work environment at Defendant Company created unnecessary stress and anxiety that impacted Mrs. Oleksa's home life, including, but not limited to, interfering with her sleep, enjoyment of pass times, and relationships with her spouse and children.

94. Based on the foregoing, Mrs. Oleksa was forced to resign her position with Defendant Company.

95. Mrs. Oleksa was wrongfully/constructively discharged on or about May 29, 2024, in retaliation for her complaints of Equal Pay Act violations by Defendants.

## COUNT I – VIOLATIONS OF THE EQUAL PAY ACT AGAINST DEFENDANT COMPANY AND DEFENDANT TRINET

96. Mrs. Oleksa repeats, reiterates, and realleges each and every fact/allegation in the preceding paragraphs, as though fully set forth herein.

97. By the actions described above, among others, Defendant Company and Defendant TriNet, by and through its ultimate decisionmaker, Defendant Leiendecker, violated the Equal Pay Act.

98. As a direct and proximate result of Defendant Company and Defendant TriNet's unlawful conduct, Mrs. Oleksa has suffered monetary and/or economic harm.

99. As a direct and proximate result of Defendant Company and Defendant TriNet's unlawful conduct, Mrs. Oleksa has suffered, and continues to suffer, injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

100. Defendant Company and Defendant TriNet's unlawful actions under the Equal Pay Act were willful.

## COUNT II – VIOLATIONS OF THE EQUAL PAY ACT AGAINST DEFENDANT LEIENDECKER

101. Mrs. Oleksa repeats, reiterates, and realleges each and every fact/allegation in the preceding paragraphs, as though fully set forth herein.

102. By the actions described above, among others, Defendant Leiendecker violated the Equal Pay Act.

103. As a direct and proximate result of Defendant Leiendecker's unlawful conduct, Mrs. Oleksa has suffered monetary and/or economic harm.

104. As a direct and proximate result of Defendant Leiendecker's unlawful conduct, Mrs. Oleksa has suffered, and continues to suffer, injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

105. Defendant Leiendecker's unlawful actions under the Equal Pay Act were willful.

## COUNT III – RETALIATION IN VIOLATION OF THE EQUAL PAY ACT

106. Mrs. Oleksa repeats, reiterates, and realleges each and every fact/allegation in the preceding paragraphs, as though fully set forth herein.

107. By the actions described above, among others, Defendants retaliated against Mrs. Oleksa in violation of the Equal Pay Act.

108. As a direct and proximate result of Defendants' unlawful conduct, Mrs. Oleksa has suffered monetary and/or economic harm.

109. As a direct and proximate result of Defendants' unlawful conduct, Mrs. Oleksa has suffered, and continues to suffer, injury, pain, ailments and conditions, and reputational harm, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering.

110. Defendants' unlawful actions constitute a willful violation of the Equal Pay Act.

## PRAYER FOR RELIEF

WHEREFORE, Mrs. Oleksa prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A. A declaratory judgment that the actions of Defendants complained of herein violated the Equal Pay Act;

B. An injunction or order permanently restraining Defendants from engaging in such unlawful conduct;

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Mrs. Oleksa for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D. An award of damages, in an amount to be determined at trial, plus prejudgment interest, to compensate Mrs. Oleksa for all non-monetary and/or compensatory damages including but not limited to emotional pain and suffering and emotional distress;

E. An award of liquidated damages, in an amount to be determined at trial for Defendants' willful conduct in violation of the Equal Pay Act;

F. Prejudgment interest on all amounts due;

G. An award for the costs and expenses of this action allowed by law, including reasonable attorneys' fees and legal expenses; and

H. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Mrs. Oleksa hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully Submitted,

HARTNETT REYES-JONES, L.L.C.

/s/ Jamie L. Reyes-Jones
JAMIE L. REYES-JONES, No. 119734
4399 Laclede Avenue
St. Louis, Missouri 63108
Telephone: (314) 531-1054
Facsimile: (314) 531-1131
jjones@hrjlaw.com
Attorneys for Plaintiffs